May it please the Court, I'm Mark Iacca, Counsel for Plaintiff and Appellant, Atlas Equity, Inc. I'd like to spend a couple of minutes this morning elaborating on the Rule 28J letter in the law review article I submitted, I think, last week or perhaps a little bit before that. In the article, Professor Niffen discusses how many courts and many scholars have conflated and confused the ProLevenance Rule with Rules of Interpretation. And, as Professor Niffen points out, you can interpret a contract until you know what the contract is. Now, traditionally, there's two viewpoints on what a court can review to determine what the contract is. The traditional Williston approach is the writing itself. The Corbin restatement, and we believe the Delaware approach, is the writing and all the facts and circumstances. What the district court did here was something akin to neither one of the traditional approaches. The court interpreted the integration clause of a form contract and said, therefore, that's conclusive. That wouldn't even fit within the Williston framework. Williston, under the district court's approach, if you had an integration clause and two signature blocks and nothing else, you'd have an integration. Well, that's wrong. The Williston approach is very much like the first step of the Delaware approach, looking at the writings to see whether they're final, complete, carefully drafted. Well, this, let me just interrupt, speaking only for myself, this sure looks like a contract to me. It's got clauses that deal with just about everything. So I don't, I'm not quite sure I understand your position that this is, we should not consider this to be an integrated contract. Well, Your Honors, the writings to be looked at here by the court initially would be the four form contracts that are virtually identical standardized forms. They're really what the restatement refers to in Section 211 as a standardized contract. And under the restatement approach, 211.3, actually, and I did not cite this in the briefs, but I would request to submit a further letter on this, where the other party has reason to believe that the party manifesting such assent would not do so if he knew that the writing contained a particular term. That term is not part of the agreement. So in other words, under the Delaware approach, if you're looking at form contracts that aren't carefully negotiated, you don't find them to be integrations. Here what you see is, for example, with the August contracts, documents that are incomplete on their face. They don't even require sales. You've got a proof problem, as I understand it. And that is that the two principal negotiators cannot establish the time frame during which these e-mails were flying around in relation to when the final contracts were actually signed. That is what the district court focused on, but it's not accurate. As we pointed out in the Fisher case, which was a 7th Circuit case. Both parties were deposed. Both parties were deposed, but the timing of the e-mails is not determinative. What was held in the Fisher case was a discussion. You need to know the time when the contract was signed. Well, you need to know. You know the time of the e-mail. If you know that the contract was confirmed after the contract was signed, and it was confirmed by conduct, and it was confirmed by specific representations, the fact that they discussed it before or the exact time of the e-mails becomes irrelevant because they confirmed it after the contract was signed. Mr. Gailwick testifies to that, and he testifies in his declaration. That they confirmed what? That they confirmed that these Ford Flow contracts were mutually binding on both sides and that the 75 percent requirement was in place. And Mr. Gailwick testified to that, both in his deposition testimony, plus recounting, and I believe it was paragraphs 15 and 17 of his declaration, recounting specific insurance given after the fact. Because this bears on what my colleagues have been asking about, I'm interested to get your take on exactly what we're applying here. This is not Article 2 because we're not talking about goods. It's not Article 9 because there's a carve-out for these types of contracts that are for collection only. So what is it? What's the law that we're governing here? Well, on the contracts themselves, you're looking either to Delaware common law, or we believe Article 2. Okay, but these are not goods.  Why would this be an Article 2? Under Section 1-103, the drafters indicate and stated in the comments, when the policies behind the code should apply, they should be applied even where it's an item specifically excluded. Okay, well, I hear your argument somewhat of a circular argument, to some degree, if it's all in the eye of the beholder. But let's assume, just for our discussion, that neither Article 2 or Article 9 applies here. What are we talking about? You say Delaware common law. What is that, the law merchant? Is that what we're talking about here? No. Delaware case law, Your Honor, for example, the Addy v. Piedmont case that we cited, the Carroll v. Arnold case. They make clear you look at all the facts and circumstances to determine whether reasonable minds could differ. If reasonable minds can differ, the issue goes to the prior facts. As to what issue? This is the parole evidence rule issue, what the contract is. Because here, Your Honor, like I was stating, the initial review is the contracts, is the forms. Here we see forms that are riddled with errors, not carefully drafted, just like the Addy v. Piedmont case. In fact, the Addy v. Piedmont case had one of the identical errors we see in these forms, a termination date that precedes the entering into the contract. They were not carefully drafted documents. They didn't answer the questions that naturally arise. In Addy v. Piedmont, there was an integration clause and a detailed participation agreement. But the court analyzed these documents and said, you know, these were not carefully drafted. And the court there denied the motion to dismiss. That's the most current case. Mr. Yockett, can I move you to a separate issue? Under Article 20 of the contract, why are we here? I mean, doesn't that basically sound the death knell for the ---- It does not. Why not?  Well, I mean, we're here to support a theory that the forward-flow contract, as we alleged, was a separately made, separate contract. But Judge Wu, I think, specifically noted that rulings by the predecessor judge on rulings on motions to dismiss can be revisited on summary judgment. And then Judge Wu specifically upheld the application of Article 20 to bar the claim. Why is he wrong? Well, two reasons. On the law of the case doctrine, there were no new facts that Judge Wu acted on. It's not law of the case because it had never been rendered to judgment. The fact that the court ruled on a motion to dismiss is not binding on the court's ultimate determination on summary judgment. So you're not going to convince me. Just because Judge Carney thought something early in the case doesn't bind Judge Wu from making a legal determination on summary judgment. Section 20 of the contract refers to minimums stated in Section 2C. Our separate forward-flow contract isn't in Section 2C. When you look at the August form contracts, there's no minimums even stated in Section 2C. It's referring to something that doesn't exist. That's item one. You can't, for Judge Wu to be correct, you'd have to say that this contract, Section 20, unambiguously as a matter of law, applies to a separate contract. It doesn't. I don't see anything in Section 20 that supports the narrow reading that you're trying to make of it because it specifically says, it talks about terminating  This agreement was never terminated, Your Honor. When it says it, the first paragraph of Section 20 puts many, many limitations on Chase's ability to terminate. I'm looking at the second paragraph. Okay. The second paragraph has two sentences. Has two sentences. One says, the first sentence says, you can terminate on five days notice, Atlas, if they don't comply. And purchaser, Atlas, can't sue for damages if that's the case. Or where it's not a fact. Well, it's a very broad, I'm looking at the second sentence, which I think is the operative provision. Quote, purchaser shall not be entitled to damages or any other remedy at law or in equity due to the seller's failure or refusal to offer said minimum unpaid balances for sale in any month. End quote. Isn't that what this whole lawsuit is about? Said minimum unpaid balances refers to Section 2C of the contract. Said, that's, it's in the preceding sentence. Section 2C is not at play with this separate agreement. Secondly, under Delaware law, it's clear that any disclaimer like that, that essentially says that this is a one-sided contract, could never be enforced. They have no sales obligation would render it illusory. And is very similar to cases decided in Delaware that indicate, if you have a provision that essentially wipes out one side's liability, it better be clear, conspicuous, unquestioned. I don't find that language ambiguous, counsel. I don't know how to write it any plainer than they did in the contract. Well, then it would render the contract unenforceable because it would be illusory on both sides. I mean, illusory on their side. They'd never have to perform. If that's the case, then the form contract goes away, and all you're left with is the one contract that's actually mutually binding. Because if they, if you can never enforce the sales obligation, what's Chase's obligation? Nothing. And that's the problem. They don't, they can terminate the contract. Did the district court refer to the termination of contract cases? Completely different situation with all due respect. If you have a contract that's terminable on notice by one side, until the, from contract formation to termination, you have a mutual binding of contract promises of some type. They're not saying that's the case. What they're saying is that they never were bound. It was a one-way option where my client had to buy at a fixed price, and they never had to sell. That doesn't make any sense, and that doesn't stand up under Delaware law. That's not what the clause talks about. It talks about the, if they don't meet the minimum requirements. It doesn't say that there's no obligation to sell or to buy. This is the clause that kicks in if, for some reason, Chase either fails or refuses to sell the minimum. And isn't that the problem here? Didn't we have months where they just either didn't have or didn't sell all of the accounts that your client wanted to buy or expected to buy? Well, it says if you don't sell the minimum stated in Section 2C. And you've got to keep in mind that in the August 2003 contracts, there was no minimum stated in 2C at all. Jump forward to the December 2005 contract, I'm sorry, December 2003, a range is stated in the form. But the other side contract that Chase admits exists, its witness admitted it existed. He admitted he made the promises. Those promises were not made in Section 2C. Well, that gets back, though, to your parole evidence issue. The question is whether or not those oral promises were either binding or not, depending on the application of the parole evidence rule. Well, I think that's exactly correct. And we found that they were not because they were admitted in violation of the parole evidence rule. So the premise for your argument fails if they are not part and parcel of an otherwise integrated contract. Well, I guess to get back to the parole evidence rule point, if the analysis includes all the facts and circumstances, this is the writing. You have writings that are facially incomplete, have errors, define the debt incorrectly, and you have admissions from Chase's responsible officer that he made the promises we allege. You know, the parole evidence rule was designed to stop fraud. Well, the Chase officer admitted he made the promises. You have the course of performance where they complied with the promises. You had trade usage where everybody admits these were supposed to be forward flow contracts. Forward flow contracts are mutually binding. On the question of fraud, that was never originally pled. It was initially pled, but after the motion to dismiss stage, my client, as I point out in the papers, my client spoke to Ed Forbes before, you know, early on in the case. Ed Forbes indicated, yeah, you're right. It was a binding deal. I don't know why they're not honoring it. At that initial hearing, Judge Carney, after they complained about our pleading, they argued it didn't properly set forth a separate agreement theory. Judge Carney disagreed. But he also cautioned us, he said, you need to be able to prove that they didn't have intent to perform. So we took our obligation seriously. We did not replead that claim at that time. A couple years go forward in the future, we find out that Ed Forbes is going to tell a different story. He's going to say, yeah, I told Gil what happened. You're telling me more than I need to know. Oh, I'm sorry. I have just one quick question before you sit down. I want to be sure I understand your complete argument. Your argument is that you cannot tell the answer under 2C because it's ambiguous. If you could tell what the minimum is, then you lose. Is that a fair statement? Under Section 20? In regard to Section 20? Under Section 20. The one Judge Talman mentioned before and Judge Wu ruled on was that if they refuse or fail to offer or refuse to sell the minimum aggregate unpaid balances in any month as required by Section 2C hereof, then in that case your sole remedy is to terminate the contract. You can't get any damages and so on. So taking that line of thought, if that's correct, then I gather your argument is that Section 2C doesn't help because it's ambiguous and therefore you can't apply that. Is that correct? Not exactly, Your Honor. My response to Section 20 would be probably threefold at least. First, as I pointed out, it doesn't apply to the separate contract. Secondly, under Delaware law, if you're going to have a provision that says, by the way, just kidding about obligations. There's no obligation here on Chase. That's got to be clear and conspicuous. It was not. Third, I believe Section 20 is in itself ambiguous because you have the first paragraph, which limits Chase's ability to terminate, is essentially read out of the contract by giving it the construction that Judge Wu wanted. Well, what does Paragraph 20 mean then? You're basically reading it out of the contract. What does it mean? I believe what Section 20 means is it can't mean that Chase doesn't have an obligation because if that's the case, it's not a proper contract. It can't mean that. What does it mean? What we believe it means is to the extent Atlas chooses to terminate, it can't proceed with the damage plan. And to that extent, we believe Section 20 is ambiguous. Okay. Thank you, Your Honor. Thank you. You've more than used your time. We'll hear from your adversary. Good morning, Your Honors. I'm Mark Blocker, and I represent Chase Bank in this manner. Your Honors, I'm going to start with Section 20, and then I'm going to move to the parole evidence issues that were raised below. But please interrupt if you have questions along the way. With respect to Section 20, I think, Judge Tallman, you put your finger exactly on what our argument is. There really is no claim after Section 20. Section 20 was plainly a part of the contract between the parties, and Section 20 makes clear that the only remedy for a violation of Section 2C for failing to sell the amount of minimum unpaid balances is termination of the contract. Mr. Yucca's argument that he just made, the fact that they didn't exercise termination, that doesn't mean that somehow that provision is inapplicable. It just means they never availed themselves of the one remedy. Mr. Blocker, let me just ask you this. As I read these contracts, it's pretty clear to me that Chase has the power to determine which contracts to sell, but I'm unclear as to where in the contract it indicates it has the authority to decide how many. Where in the contract does it indicate that Chase has that right? Let me walk you through that, Judge. We didn't have an opportunity to respond to that because it was only grace and there were five years. But let me walk you through it. Okay. The definition is of charged-off accounts. So you start with the definition of charged-off accounts, and I'm looking at ER 972, just for your understanding. It says, Charged-off account means an account which the seller has charged off, the unpaid balance of which is uncollectible. So when you get the definition of charged-off account imports the notion of unpaid balance. So when you're selecting an account, you're also selecting an unpaid balance. Okay. So by definition, that's what's left over then. That's correct. And here's what else I would say about the plaintiff's argument that he made only in the reply brief. If you look, there are three separate commitments in Section 2C that were made, and let me just walk through them. First, there's the sole discretion to choose the accounts. That's what your Honor is alluding to. Second, there's a commitment that says we can sell to somebody else. We can use our discretion to sell charged-off accounts to other people. And then it says, but still, you have to sell between $10 and $35 million worth of accounts to Atlas. Now, what the plaintiff wants you to do is look at only that first sentence in isolation, but you can't look at the first sentence in isolation. You have to look at all three of them together, because what it's saying is you can choose the accounts, and when you do choose the accounts, you're choosing an unpaid balance, but the net effect of that has to be that it is between $10 and $35 million. So Chase does have the right to choose the amount of unpaid balances that are going to be sold each month, so long as their discretion is constrained by the need to sell between $10 and $35 million. And their remedy, if you don't, is Section 20. Correct, but let me point out something else, Judge Smith. There is no dispute here that every month, the main contract, 80% of the damages in this case are generated by this contract that was signed in December. 80% of the damages were under that contract. There is no dispute that every month, the contract was enforced. We sold at least $10 million worth of accounts. So if Atlas, for some reason, thought that wasn't a proper minimum because of some other agreement, they could have terminated it, but they never did. Well, that gets us back to the question that I asked Mr. Yucca. At least by my reading, Article 2 doesn't cover this, and Article 9 doesn't cover it. Do you think it's either of those two, and if not, what law are we applying here? Well, I'll take them one at a time. We know Article 2 doesn't apply because that was the easiest part of it. And footnote points to that, Judge Smith. The UCC never even got raised as an issue until there was a proposed statement of decision. In the response, that was the first time the plaintiff ever raised any issues about the UCC. Second, we always thought it was Article 9 that did apply because this was a sale of uncollectible accounts. It was a sale of debt. But regardless, even if your honors disagree and decide it's not Article 2 or not Article 9, you just apply Delaware common law, the common law applicable to Delaware contract law. And if you do, you should surely affirm Judge Wu's ruling because, as Judge Tallman has already pointed out, Section 20 provided Atlas with one and only one remedy, and it wasn't a remedy for damages. And that was really the end of the equation. And if you get there under Article 9? I'm sorry? If you apply Article 9, would you just spell it out for me? I don't. We didn't brief that, and I didn't prepare it, so I'm happy to submit something that would explain how you get there under Article 9. But we've always assumed that this was covered by Delaware common law because this was a contract. Oh, okay. I thought you said you always assumed it was covered by Article 9. Well, we assumed if any portion of the UCC was applicable, it was Article 9. Nobody ever really argued it. And from your perspective, it doesn't make any difference if Delaware common law helps you. Article 2, Article 9, Delaware common law, it all gets you to the same place. Article 9 is going to take you to the terms of the contract. That's right. And so at the end of the day, you end up back in Section 20, which really vitiates all the plaintiffs' claims. I'll spend just a couple minutes, if Your Honors have questions about the integration clause, because this was really a focus of the district court, and we do think it was an independent ground for the district court to rule the way it did. But at the end of the day, this case, in my mind, is really a classic example of why you have integration clauses. As a contracting party, you want an integration clause for two reasons, right? One, you want to know what the contract terms are. You want to be able to go to a document and look and see what the contract terms are. And second, if you get hailed into court, as we were here, with a claim that, no, there's some other term that was in an e-mail or an oral conversation, you want to be able to knock that out right away and not have to spend money and go all the way to trial to be able to enforce your contract. This case screams out for enforcement of the integration clause. This was a 24-page contract, and I can't remember which judge said it, but it looks like a contract to me. That was my reaction when I first saw the contract. And it looks like a contract to me. But years later, now we learn that this contract, and the plaintiffs refer to it throughout their brief as a form, as if somehow that takes it out of the contract realm. Let me ask you this question. Yeah. This obviously is, these types of sales are quite common these days. Does each contracting party basically do its own contract, or is there sort of an industry-wide form used for this type of thing? I don't know if there's an industry-wide form used today. This was at sale of Jetpack six years ago in 2004. And did Chase use this same form for its sales to other people? Certainly in 2003, 2004, as you can tell from the record, Chase used this form. But the fact that it used the form doesn't somehow allow the court or the plaintiff to throw the form into the trash. No, no, I'm not looking at it on that basis. I'm trying to understand the commercial practice that was involved here. If this is a form that was used repeatedly by lots of different people, I think it gives all the more substance to the point that this is a contract. This is what, these are very sophisticated players on both sides, dealing with a lot of money, and they're all represented by Able Counsel. We don't have that many banks anymore, so. Right. Certainly not in California. Not here either. One big bank using this form many times. That's right. They establish an industry firm. That's right. Well, there's nothing in the record that tells you one way or the other. Right. I believe it was practiced at the time for most vendors of debt or sellers of debt to have their own contracts. I'm not aware that there was sort of an industry standard contract like you would have with swap agreements or insurance. Okay. These are not output contracts in a bank setting, right? No. Okay. Your Honors, I don't want to, I know I have a few minutes left, but I don't know. You don't have to use it. Okay. Thank you, Your Honors. Thank you. Thank you. You can have a minute. Counsel indicated that the UCC wasn't raised until late in the game. I'll point out that the district court applied the UCC on the termination clause with respect to Delaware's doctrine for remedies that failed their essential purpose. And he applied that in this case. So indicating that the UCC was not an issue is inaccurate. And the failure of essential purpose doctrine, Judge Talman, is another reason why we believe that Section 20 fails. Secondly, you know, this discussion about these look like contracts to me, you need, Delaware law is real clear that you look at whether, even if it's long and complicated, you look at whether it's a carefully drafted document. And the district court relied on a district court case called J.A. Moore, which was completely, did exactly what Professor Niffen says you shouldn't do. It relies on a plain reading interpretation case to come up with a pronouncement on the integration clause. It's not been followed by any parole evidence decision in Delaware. Thank you. You have used your time. Thank you. Thank you. The matter just argued is submitted for decision. We'll hear the argument in the last case, Islamic Shura Council of Southern California versus the FBI, in accordance with the procedure that was indicated in the order that the court filed last week. Thank you.
judges: Schroeder, Tallman, Smith M.